UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Kimberla Linton, | ) | Civil Action No. 4: 03-3067-RBH-TER |
| | ) | No. 4:04-0645-RBH-TER |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | REPORT AND RECOMMENDATION |
| | ) | |
| Chesterfield County School District, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff initially filed this action in state court alleging a state law breach of contract cause of action, as well as a violation of 42 U.S.C. §1981. Defendant timely removed the matter to this court. Plaintiff subsequently filed the companion action alleging violations of Title VII. The cases were consolidated by order filed May 13, 2004. The parties have engaged in discovery and the case now is before the court[1] on defendant's motion for summary judgment filed January 18, 2005 (Document # 18 [03-3067] and Document # 12 [04-645]).

**Facts**

The facts generally are not in dispute. In 1992, after graduating from college, plaintiff applied for a teaching position with the Defendant Chesterfield County School District. Although she was not offered a job teaching, she was offered a job working for the defendant as a Medicaid Billing Clerk. During the 1992-93 school year, Dr. Sylvia Myers and Butch Patterson, the Principal of Pageland Central High School, asked plaintiff to teach general science and two other science

---

[1] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. §636 and Local Rule 73.02, D.S.C. Because this is a dispositive motion, a report and recommendation is entered.

-1-

classes to high school level students at Pageland Central High School. She agreed to teach the courses and did so for the remainder of the school year. At the end of the year, she assumed more teaching duties. She taught 8th grade level business education classes to students in honors level math and english. She also taught Keyboarding, Acting I and II, Entrepreneurship, Computer Tech I and II, business law, and computer applications. She continued in this teaching capacity through May of 2000.

In 2000, plaintiff was working under a principal, Dr. Arrowwood, who recommended her for a promotion to Assistant Principal at South Florence High School which is in the Florence County School District. She was hired for the position prior to even filling out the application for the position.

While at South Florence High School, plaintiff worked mostly with 10th grade students and her duties involved discipline, club and activity schedules and covering ball games. In or about February 2001, Dr. Donald Caudle, a member of the defendant's Board of Directors, and Dr. Williams, an administrator with defendant, solicited plaintiff to return to Chesterfield County. As a result, she interviewed for and subsequently was hired as Assistant Principle of Petersburg Elementary School which is in the defendant school district. The interview panel for the position consisted of Dr. Williams, Donna Pittman, Ms. Eubanks (principal of the school), Kim Douglas (a fourth grade teacher), Donna Boggs (curriculum coordinator for Petersburg), and a person from the community. All of the panel members were white. Plaintiff maintained the assistant principal position for two years, beginning with the 2001-2002 school year.

As an Assistant Principal at Petersburg, plaintiff worked with students in pre-kindergarten through 4th grade. Her duties in this position involved handling discipline and classroom

misconduct, scheduling and coordinating field trips. Also, she was responsible for report cards, scheduling, teacher assignments, creating duty assignments, student records and enrollment, crisis management plans, curriculum development, personnel issues within the school, parent contact, and notifications, in the elementary school. She also worked on the School Renewal Plan and coordinated the 21 Century after school program and the school's summer school program. Plaintiff asserts that she had prior experience working with children of this age level when she taught Sunday school to pre-school children for four or five years prior to accepting the job at Petersburg.

Plaintiff states that she was given many opportunities while assistant principal to perform principal level duties, because Ms. Eubanks planned to retire and was grooming her to become the Principal after her retirement. Plaintiff pursued and received an Elementary Certification from Winthrop University in December 2001, because she was told by Dr. Dinkins that it would be difficult for someone to obtain a principal's position without that qualification.

In May 2002, as a result of Ms. Eubanks' departure, the principal's position became available at Petersburg. The job was posted and plaintiff submitted an application. The selection committee included Dr. Williams, Dr. Patterson, Dr. Weatherby, and another woman, who were all white. Dr. Dinkins was the decision maker. Mr. Sutton, a white male, was chosen for the position. According to plaintiff, Dr. Dinkins informed plaintiff that to be considered for a principal's position, an applicant needed at least three years experience as an assistant principal. According to plaintiff, Dr. Dinkins previously advised her that she should obtain a certification in Elementary to be qualified to a principal of an elementary school, which she did.

Plaintiff worked with Mr. Sutton and operations ran smoothly. Plaintiff worked a lot with the students, parents and teachers and developed a good rapport with them. Mr. Sutton allowed

-3-

plaintiff to be involved in all areas of administration, including decision-making. She was exposed to all areas of the principal's job.

In 2003, defendant planned to split the Petersburg Elementary into two new schools. Pageland Elementary was created and used the existing buildings and location from the former Pageland Middle School. As a result of the split, a new principal was needed to serve the new Pageland Elementary School.

In May 2003, defendant posted the job opening as principal of Pageland Elementary, as well as a vacancy in the principal's position at Chesterfield Intermediate School. The qualifications for a principal position as set forth in the job posting were as follows:

> 1. A valid South Carolina Elementary Principal Certificate (or eligible for certification).
> 2. At least five (5) years successful teaching experience required.
> 3. Experience as an assistant principal/principal.
> 4. Demonstrated success in educational leadership.
> 5. Ability to organize school, work with faculty, parents and students.
> 6. Ability to be the instructional leader in the school.
> 7. Other qualifications as determined by the school district.

Mr. Sutton gave plaintiff a copy of the announcement, and encouraged her to apply. At least two other individuals, John David Nutt and Mark Robertson, both white males, applied for the open positions.[2] Dr. Williams, Mr. Patterson, and Mrs. Ellerbe screened the applicants to determine who would be interviewed.

An interview panel was formed and consisted of Dr. Dinkins, Superintendent; Dr. John Williams, Assistant Superintendent for Personnel; Mr. Frank Patterson, Assistant Superintendent

---

[2] On page 2 of their brief, defendant asserts that a number of other candidates applied for the position and cite to page 91 of plaintiff's deposition and Exhibit 2 to their memorandum. It is unclear whether or not the cited material supports this statement. However, Dr. Williams testified that four applicants were interviewed. (Williams Dep. at 18-19).

for Operations; Mrs. Frieda Ellerbe, Director of Adult Education/Family Literacy; Mrs. Linda Wohlwinder, Member of Cheraw Advisory Council; Mr. Frankie English, Teach, Cheraw Intermediate School; and Mr. Marvin Swanson, Teacher, Pageland Middle School. This interview panel did not have decision making authority which was vested completely in Dr. Dinkins.

During the interview process, the panel members asked questions to the applicants. At the time, plaintiff did not question, or find unusual, the composition of the committee, the interview format, or the conduct of the interview, except that Dr. Dinkins questioned whether or not she actually had a year's experience at South Florence when she did not begin at the beginning of the school year. The committee took notes; however, the notes were destroyed because defendant did not want the information contained in the notes "going out" after the selection was made because of the nature of the material.

Plaintiff met the qualifications listed on the job posting, including a South Carolina Elementary Principal Certificate; in excess of five years of successful teaching experience; three years experience as an assistant principal; and she had demonstrated success in educational leadership and her ability to be the instructional leader in the school, as well as other qualifications, including her experience with the very teachers, students, and staff from the former Petersburg Elementary who were now part of the Pageland Elementary.

Mr. Nutt met the qualifications listed in the job posting, including a South Carolina Elementary Principal Certificate; two years experience as an assistant principal; and he had demonstrated educational leadership and his ability to be the instructional leader in the school, as well as other qualifications, including having served as an assistant coach, an elementary school physical education teacher for several years, and had been an assistant principal in a middle school

in Florence for two years.  He had also served as a summer-school principal in the Florence school district.  However, Mr. Nutt did not have five years of successful teaching experience, but had three years teaching primarily physical education.

Both plaintiff and Mr. Nutt possessed a master's degree and had other experience and qualifications.  Committee members Patterson, Williams, Dinkins and Ellerbe, an African-American administrator and only African-American member of the panel, testified that plaintiff did not demonstrate good interpersonal skills, enthusiasm, or otherwise perform well during her interview. (Patterson Aff. ¶5; Williams Dep. at 13-14, 16, 18; Dinkins Dep. at 18-21; Ellerbe Aff. ¶6).  Dinkins and Williams testified that Mr. Nutt and Mr. Robertson distinguished themselves during their interviews.  (Dinkins Dep. at 21, 23; Williams Dep. at 13-17).  By way of affidavit, plaintiff states that, after the interviews but before the selection was made, Dr. Williams informed her that the interview went well and that things looked good. (Plaint. Aff. ¶79).  She also states that during an interview with Dr. Dinkins after the selection was made, he did not mention anything about her interview.  (Plaint. Aff. ¶84).

Mr. Nutt was selected for the Pageland principal's position.  Mr. Robertson was selected for the Chesterfield Intermediate position.

Around the time of the selection process for the Pageland principal position, defendant approached plaintiff about transferring to a position as Director of the school district's Palmetto Learning Center, an alternative school for students with disciplinary and other problems that make it inappropriate for them to attend the high schools.  A contract for this position was offered to her after the interview and before she learned that Mr. Nutt had been selected. (Plaint. Aff. ¶¶81-82). Plaintiff accepted the position.  The prior director was a "lead" teacher, and not an administrator.

Defendant agreed to pay plaintiff at the same salary she was paid as assistant principal, which was in excess of that paid the former director.

In the summer of 2004, Dr. Dinkins appointed two white females to principal positions without posting the positions. He had not appointed anyone to a principal position before. Neither woman had experience as a principal before being appointed. Plaintiff states by affidavit that, also in the summer of 2004, she sought a raise in pay to the principal's pay level because of the growth of the Palmetto Learning Center and her increased responsibilities. She states that at a meeting with Dr. Williams, Dr. Williams told her that if she would dismiss this lawsuit, her request for a pay raise would be granted.

Dr. Dinkins and Dr. Williams submitted to depositions and discussed many of the issues relevant to this case. Dr. Dinkins testified at deposition in part as follows:

> A. Well, I will tell you this, you know, it seemed like everything - - every time something would come up, you know, she would call board members and these kinds of things too and that wasn't - - that wasn't to me the best way to handle a lot of the situations even when she was an Assistant Principal.
> Q. Okay. What kinds of situations are you talking about?
> A. The only one that pops in my mind now, I know there were several, you know, it seemed like one year she wanted her child in the kindergarten program or something like that and that he didn't meet the criteria and we told her that, that he had to meet the criteria and then, the next thing I know she had called Mr. Caudle, as a matter of fact, to see it we couldn't make some exception and, you know, you just got to learn that you have to work with the - - work with the system and within the system. And when you get to be a principal you have to do that also. So that's just one example and it seemed like there was - - there was several of those.
> Q. Can you think of any instances where there was something she should have handled herself as an Assistant Principal business wise and she called the board instead, or are these personal issues like the fact that she didn't like her child in wherever he was?
> A. I can't. I can't think of any at this point.

(Dinkins Dep. at pp. 16-17)

Q. Thank you. During the panel interview, and you are right, I have heard people describe the panel interview before, were you at the panel interview for Ms. Linton for the Pageland Elementary position?

A. I'm sure I was.

Q. And do you have any independent recollection of it sitting here today?

A. The interview wasn't that good.

Q. Do you remember being there?

A. I remember being there and it wasn't - - the interview wasn't that good.

Q. Tell me what you mean by the interview wasn't that good.

A. She just didn't appear to be ready to be a principal. When I say it wasn't that good I guess you're talking about she didn't seem to have the expertise, the enthusiasm at that point to, to, to assume the role of a principalship which is a challenging position.

Q. Was it just her demeanor at the interview that makes you say that or was there some technical degree or certificate that you felt she was missing?

A. No. It wasn't any degree or anything like that. No, she had the - - you know, with the exception of not having the elementary certificate, you know, she had the - - I believe she's got the Masters Degree or Masters Plus 30. I'm not - - I don't even recall. But she had, you know, the basics with the exception of the endorsement. In South Carolina you have to have an endorsement of elementary school. She did not have that.

Q. And what is that?

A. Well, you have to have certain courses to have the full certification in elementary.

Q. What is - - and I don't understand. I have never heard of endorsement of elementary school. Can you tell me what that is?

A. Okay. You above a certificate and on your certificate you are certified as like a math teacher or a social studies teacher, elementary principal, secondary principal, superintendent, whatever. From what I recall, and you got to remember now, it's been probably three or four, three years or so now.

Q. I understand.

A. And I've left the District and been gone for two and half or three months. So, I've dealt with some other stuff since then.

Q. I bet you have.

A. So I got to recall back. From what I recall, and my memory is usually pretty good, she had business education, she had secondary school principalship. She didn't have the elementary and that is what I'm talking about as far as the endorsement or area of certification might be how you have heard it.

Q. Okay. What aspects of her interview made you feel like she wasn't ready to be a principal or didn't have the enthusiasm to take on the role?

A. I don't recall anything.

-8-

Q. I just - - to rephrase the question, what I want to know is if you just made an intuitive judgment call or if there are certain aspects you can tell me, well she didn't answer this questions well or she did this or she didn't do that?

A. I can't remember specifically her answers to the questions. I can just tell you generally, you know, her interview was, she seemed to be unsure of herself, she seemed to not be a very energetic, enthusiastic person, but, I mean, I can't remember her specific answers.

(Dinkins Dep. at pp. 18-21)

Q. Do you recognize Exhibit 1, Dr. Dinkins?

A. I assume I do because we did this for every position, every time we advertised for a principal. So I am sure this is the one we had for Pageland Elementary.

Q. Okay. And if and when screening is done is it screened against the general qualifications that are on the notice?

A. Uh-huh. Yes, it is.

Q. Okay. And you wouldn't be interviewing somebody who didn't at least have the basic qualifications on the notice, would you?

A. Not necessarily. Not necessarily. We would like to have the basic qualification, but here again, sometimes it's hard to get candidates.

Q. Okay. Do you know whether Mr. Nutt had the five years successful teaching experience?

A. I don't recall.

Q. If he did not have five year successful teaching experience would he have been qualified for this job?

A. Would he have been qualified for this job?

Q. Uh-huh.

A. Yeah. Yeah. You could have had that. This is a guide to go by. Just like it says experience as assistant principal/principal. We would like to have that but it doesn't always, doesn't always occur.

Q. Okay. Who makes the decision as to what qualifications are posted?

A. When I was here I did.

Q. All right. And do you know whether you made the decision for what qualifications were posted for this job?

A. I assume I did.

Q. Who decides whether a qualification, for instance, the five years successful teaching experience, can be overlooked for a candidate?

A. Well, the way we operated when I was here and this is prior to July 1, this was drawn up and posted in the schools and announced and on most occasions for principals we would advertise in the newspaper, somewhere in the state, usually The State newspaper, not always. We had candidates in the District. And actually if they were screened down we would - - usually Dr. Williams, he was the Assistant Superintendent for Personnel and sometimes

another one or two District folks would, would screen them down. After the interview process, if we didn't - - if we had somebody that we felt was a good candidate and there were - - didn't have all these, then that's when actually Dr. Williams and I would confer on the matter and make a determination if we need to consider this person further, even though they didn't have like principal experience or assistant principal experience or five years teaching. That's where we would make a decision on that.

Q. So would that be if somebody was initially screen out but the applicants you interviewed were not acceptable, you might go back to the original pool and see if there was somebody else that might be good?

A. Theoretically that could happen.

Q. Is that the process you are talking about?

A. On this position? Is that what you are talking about, on this position at Pageland Elementary?

Q. Well, I wanted to know, you know, who makes the decision on whether you are going to consider somebody who didn't actually meet the qualifications on the notice?

A. All right. I just said that. What we would do is after we go through the screening committee, we would have our top two or three candidates or four candidates, or however many, you know, the committee would recommend to me. Usually if it was one school, they would recommend their top two. That day I don't remember because we were interviewing for two schools, and then I would look at the candidate and look over their record and actually Dr. Williams was the Assistant Superintendent at that time and if we had someone that didn't have the five years or didn't have the assistant principal experience, then we would look at the overall picture to see if we felt like they were a good candidate.

Q. Okay. And if somebody doesn't have the objective criteria do they - - would they make it to the panel interview?

A. If they didn't have this?

Q. Right.

A. Well, you know, they could. You know, it's it's not always. I mean, there is not exact science in this thing. Now, if you want to pin down one person responsible when I was here it was me. I mean, I'm not going to pass it off on anybody else because of everything, you know, if somebody had to make a decision, I would do it. So, we did want somebody that had elementary principal certificate. Now if you want to go back to the Exhibit, when we hired Kim Linton at Petersburg we probably - - I'm sure we said valid elementary principal certificate for that Assistant Principal job. But there's a good example. So I don't know what your point is here. But, you know, that's my point, on when we hired her at Petersburg as Assistant Principal because she would have not met the basic criteria. And I don't know. I think he had two years as Assistant Principal at some school in Florence, Sneed

-10-

Elementary or Sneed Middle School. That rings a bell. But I don't recall. I guess what I'm saying, if everything - - if we had plenty of applicants and everybody was certified it would be great to make sure you held everybody to five years and all these other things. This is what we try to go by, but you couldn't always go by that.

Q. Do you see those as preferred qualifications but not necessarily needed?

A. Well, if you really want to get technical, it probably should say preferred, if you want to get technical. But see on all of them it would say valid South Carolina Elementary Principal Certificate because you're looking for an elementary principal. That's what you want. But if you don't have one, then you've got to go back to the drawing board. And I go back to the case when we hired Kim Linton up at Petersburg Elementary. If you pull that sheet I'm sure it would say valid South Carolina Elementary Principal Certificate, but she didn't have it. She had the secondary.

Q. How important was it to you that the principal at the Pageland Elementary School have had experience in an elementary school versus another type like middle or high school?

A. I would think - - to me that was important. Because it's a new elementary school, we wanted someone that, that, you know, had elementary experience. And clearly from what I recall, clearly Mr. Nutt was a superior candidate.

Q. And I understand he was superior in person in your view. How about his-

A. Qualifications?

Q. How about his qualifications and experience with an elementary school experience as an administrator?

A. If I recall, he had taught at an elementary school and he had been the assistant principal in an elementary school. Now, I'm not certain about the teaching but I think he was a teacher at the elementary school.

(Dinkins Dep. at pp. 25-31)

Q. Okay. Who made the decision to offer Ms. Linton the Director position at the Palmetto Learning Center?

A. I did.

Q. And who made the decision to offer it to her at assistant principal salary?

A. I probably had input from some others but I did.

Q. Okay. And why did you make that decision?

A. Because she had now applied for the principal job, several principal jobs. She was not - - you know, I knew that Kim wanted to be principal. She had not received the - - and no, that was prior to us interviewing from what I recall for Pageland Elementary. I don't remember what dates we interviewed but it seems like it was about that time and I had a talk with Kim and told her that we would transfer her to Palmetto Learning Center. Actually the 225 days and the assistant principal salary was more than what we had been paying down there. The former director, as I remember, was on something

-11-

like 210 or 15 days and I might be wrong on that, but it wasn't - - I don't remember it being 225 and I think - - in fact, I know she was getting paid much less than the assistance principal salary schedule. So I felt like it - - and I had told Kim that she needed to go somewhere and have successful experience for, that is where the two, three or four years come into play and that's when we transferred her over there. I did not think it was fair to cut her back to the teachers' scale which I think the former Director from what I recall was on a teacher's salary schedule, and don't hold me specifically to that because I'm going back from memory, plus a little supplement. And so we said we would put her at 225 and keep her on the assistant principal pay scale.

(Dinkins Dep. at pp. 36-37)

Q. Do you know if two principal positions were appointed rather than advertised right before you left?

A. Two positions? Which ones you talking about?

Q. Vickie Buckner and Candice Hoffman?

A. Vickie Buckner? Yeah, Vickie Buckner was - - she was transferred from Chesterfield-Ruby Middle School to Edwards Elementary School.

Q. Okay. And what did she do at Ruby?

A. She was Assistant Principal at Chesterfield-Ruby Middle School.

Q. And you said she was transferred to?

A. Edwards Elementary as the Principal?

Q. And who decided to make that transfer?

A. I did.

Q. Okay. Why wasn't that position advertised?

A. Well, actually let me back up. Dr. Williams and I were together on that. We discussed that. Because that happened some time in May and as of about the first of May the Board asked me to make sure that Dr. Williams was included in all personnel decisions after that point since he was going to be working with them. So I'm sure and, in fact, I know we conferred on that. Your questions is why wasn't that position advertised?

Q. Right. Why a transfer?

A. All right. We were right in the middle, and I was leaving the District, we were right in the middle of budget problems. We were trying to balance our budget. We had another position at the District Office, another person was leaving, our Director of Instruction had announced that she was leaving. So we had a vacancy here. Dr. Williams and I discussed it and we wanted to bring in the Principal at Edwards to the District Office in that position as Director of Instruction. So that wasn't advertised. An in the change over we went ahead and transferred Vickie Buckner. To answer your questions the only thing I can tell you is we knew exactly that we had an experienced person there that we felt like was highly qualified and so we transferred them

-12-

there.  It was an in-district transfer.  That's why it wasn't advertised.  You know, there was no sense in going through the motions when we knew who we were going to hire.

Q. Okay.  And how about Candice Hoffman?

A.  All right.  Candice is a little different situation.  We had a Principal at McBee Elementary named Daisy Wiley and Daisy got sick, I don't know.  I'm sure you know the dates, sometime in the Fall, maybe October or something, got sick and was out of school for several weeks and was back a day or two and then out and right before - - actually before Thanksgiving we split the duties down there and that was my decision with input from Dr. Williams.  We split the duties down there between Frances Paterson and Candice Hoffman.  When I say split the duties, Frances would to go one week and was the acting principal and Candice would go the next week.  Well, we got the word right around Thanksgiving time, from what I recall, that Daisy would not be back until, we were told, like January and maybe even later.  So we felt like we needed to go ahead and at least have an acting principal, somebody full time.  So because of the responsibilities that Frances had, she was working with a lot of things here that we needed handled, we decided to put Candice down there as the acting principal.  So Candice went to McBee full time I think I don't know, I could get that date, but it was December or January.  No later than right after Christmas.  And in effect Candice - - we had planned - - fact, we told Candice that if Daisy didn't come back - - because she had told us she would like to be principal.  And at that point we were thinking Daisy would come back.  We had told her if she came back that she would come back into here job in the District Office.  Well, to be honest with you, Candice went down there and did a good job.  In the meantime, Daisy died.  So based on the performance she had down there, she did, you know, an outstanding job, we went ahead and named her the Principal after Daisy died.  We needed to go ahead and get a principal in place.

Q. Okay.  And any reason why you didn't open it up for advertising?

A. Here again, she had done a good job.  She had done an outstanding job.

Q. And both of these ladies were white ladies, right?

A.  That's correct.

Q. And neither of them had the experience in administration that Ms. Linton had, did they?

A.  Oh no.  No, you're wrong there.  Vicki Buckner had been Assistant Principal at Chesterfield-Ruby.  Vickie Buckner prior to that was Assistant Principal at Cheraw Intermediate.  I think she  was over there two years.  Prior to that she was Assistant Principal at Jefferson Elementary.  She probably had four or five maybe six years, probably five years experience maybe.  I believe it was five.  Candice Hoffman had been the Assistant Principal at Jefferson Elementary and in our reorganization she was brought

into the District Office.  And she was elementary certified from what I recall.

Q. So Ms. Buckner had been there at three different schools over about five years?

A. She had been at three different schools.  No, she had - - she had actually - - Ms. Buckner has got about 28 years experience, 20 something years experience.

Q. I am talking about as administrator, not as assistant principal?

A. As administrator?  She was an Assistant Principal at Jefferson.  Now you have got to remember when you say that I know what you are saying.  You are saying how come you moved her after two or three years.  Well, we moved her in our reorganization.  See, we went through a massive reorganization that one Summer, Summer between 2003 and 2004, I think the Summer of 2003 and we shuffled it seems like around 300 people.  So her transfer were due to moving of building.  You know, see what I'm saying.  Moving - - because she was reassigned several places because of our reorganization.  Now, we had selected her to be Principal of Edwards.

Q. And at that point neither of these ladies had held a Directorship or a Principal position before, had they?

A. No, they had not been principals before.  Now Candice wasn't a Director.  She was the Coordinator of Testing.  We had several other jobs that she did up here at the District Office.

Q. Have you ever appointed a principal before that time rather than advertise for it?

A. Appointed a principal?  Let's see.  I have to think here.  I don't recall any time.  I don't recall.  We hired several and I'm, I'm not sure.  I don't recall us appointing any.  Well, there were some - - like I say, there were some-in-district transfers, and like I say, but I don't remember.  We moved Paul Anderson down to Plainview but I can't recall if we just appointed him or not.  I can't recall.

(Dinkins Dep. at pp. 40-45)

Dr. Williams testified at deposition in part as follows:

Q. Mr. Nutt clearly doesn't have five years teaching experience.

A. Uh-huh.

Q. How did you all get around that and allow him to interview?

A. Five - - five years is an arbitrary number that Dr. Dinkins and I at some point, and maybe it was before I came to the District office, came up with and we tended to reuse the postings.  Nothing magical about five years.  Five years sounds like a good number.  But if we have a good candidate then we interview those based on our pool, based on the quality of the pool, how many applicants we have and it doesn't limit you to five years.  It's just the preferred number that we arbitrarily came up with.

Q. Okay. If it's preferred, is it weighted at all as to whether somebody actually has the qualifications on the sheet versus somebody who doesn't?

A. I can't ever remember us having a discussion where an applicant had four years, three years, two years and we said, "No, it doesn't meet our qualifications. We are not going to interview this person."

Q. But if you put it on there does it follow that if they do have five years it is better than somebody who doesn't?

A. I think more - - the more experience you have is better. But there again, as far as that being a magical number, I don't - - I don't have any feelings that that is a magical number.

(Williams Dep. at pp. 11-12)

Q. Okay. Anything - - are there any objective criteria that Mr. Nutt had that were better than what Ms. Linton offered?

A. I would have to go back and look at the two resumes. I think they were substantially similar. I preferred the fact that Mr. Nutt had elementary teaching position, teaching experience and Ms. Linton does not have any elementary teaching experience I don't believe. I believe as I remember that's one, one thing that I thought of. I believe - - I believe I remember that the quality - - the types of administrative experiences that Mr. Nutt had may have been somewhat better than the type of administrative experience that Ms. Linton had at the time of the interview.

Q. Okay. Can you expound on that? How was Mr. Nutt's two years at Delmae, I believe, were - -

A. Well, there again, it's hard to remember but it just, it just - - as I remember there were some things in the interview process and looking at the resumes, some of his experiences he had that one might have been better than the other. But I don't remember anything specifically.

Q. So you can't tell me what those experiences might have been?

A. Not specifically.

(Williams Dep. at pp. 14-15)

Q. Any other reason you can think of upon which you would have based your decision that Mr. Nutt was a better candidate than Ms. Linton besides what we have already talked about?

A. Well, the actual interview. Mr. Nutt was outstanding. Ms. Linton was - - well, I would have to say Ms. Linton's was not, not strong at all.

Q. And you say you have to separate knowing the lady from the interview process. Did she act differently outside of the interview?

A. Well, what I mean by that is I know Ms. Linton knows more about children and education than she exhibited in the interview process.

Q. Okay. And yet you base your decision on what she said in the interview rather than your knowledge of Ms. Linton outside the interview?

-15-

A. No.  I don't know that we have talked about what my decision was, but no, I base my decision of everything that I know about the individual.  A lot of times I don't know anything else, but with Ms. Linton I did.

Q. Any other things that you knew about Ms. Linton that caused you not to recommend her for this position?

A. Now, we're talking about the Pageland Elementary position? Somewhere we switched over from Petersburg to Pageland Elementary?

Q. I am asking about Pageland for the principal position.

A. Rephrase that question again.

Q. Well, what I want to know, I am trying to find anything objective that you can tell me or anything you can explain to me as to why you chose to recommend Mr. Nutt over Ms. Linton for this position.

A. First of all, let me say - - let me tell you what I remember as being what I told Dr. Dinkins and I don't know if you know this or not, but at the beginning of the interview process, as personnel director, I make a - - I make a statement to the group that this is not a vote.  We don't  - - we don't sit around and vote and whoever gets the most votes win.  The Superintendent is responsible for the decision of a principal. If the principal does a good job, he will get all the credit.  If the principal does a bad job, he is going to get all the blame.  Our job is to give him the best information that we can and then ultimately he has to make the decision who he wants to hire.  And after the interview process, when it came to me making my statements, I said that of the people that we interviewed, and I know you asked the question earlier how many and I'm not sure either, but I do know that - - I do remember four for sure and David Nutt I thought did the best interview.  Mark Robertson I think was the second best.  Sandra Sowell was the third best and then there were kind of the others.  As I remember we - - several of us commented on her interview skills were not good, but I believe I did say that outside of this process, you know, Kim presents herself in a better manner and seems to be more knowledgeable about it.  So that's basically it.  When you say my recommendation I didn't say hire her or not hire.  I just gave my opinions about the interview situation and what I know about Kim outside of the, outside of this room.

(Williams Dep. at pp. 16-19)

A. Can I say something else that I - -

Q. Certainly.

A. - - remember that I was involved and at least Dr. Dinkins and my thinking and I'm not sure included any other thinking.  There were two incidents that Kim was involved in.  One involved her salary at Petersburg as an assistant principal.  Kim was hired to be paid as an assistant principal and this, this helped me remember that plus, like I said, I got confused when we switched over from Petersburg to Pageland Elementary. Kim - - I don't know whether

-16-

she got a check or she received word that she was going to be paid as a curriculum coordinator which is somewhat less salary. And I think Kim got very upset about it which is understandable and Kim called me up saying that she was very upset and very direct. "Hey, you told me you know, what my salary was." I said, "Kim you're right. You're absolutely right. Apparently this was a misunderstanding, but I will get it fixed." I said, "Give me, give me an hour and I've got to meet with Dr. Dinkins to get his okay but we will get it fixed." So right after that I was meeting with Dr. Dinkins and not long after that I got a call from Mr. Caudle. She had already called Mr. Caudle to make these same complaints about her salary which to me was inappropriate to call a Board member about her salary. She should have left it with me to handle. I told her I would. The other incident is one that Dr. Dinkins related to you a little bit about her child getting in kindergarten. She wanted her child to enter kindergarten, as I remember, earlier than the state law and she called me about it but she also called the then curriculum director at that time and tried to put a lot of pressure on her to make the change and there again, she got - - I think got Mr. Caudle involved in that, that issue.

Q. Okay.

A. So just, just the chain of command concerns there.

Q. And neither of those two incidents had anything to do with her performance of duties as an administrator, did they?

A. No. Just judgment issues.

(Williams Dep. at pp. 21-23)

Q. Do you specifically remember whether he called you or told you that Ms. Linton was not selected and that somebody else was?

A. I don't - - no, I don't think he would have said Ms. Linton is not selected. But I'm sure within a couple of days at least he told me David Nutt was selected.

Q. And at that time did you send a contract to Ms. Linton for the Director position at the Palmetto Learning Center?

A. I don't - - at some point we did. I, I had a couple of conversations with Ms. Linton on the phone I think and at her school I believe in the meantime. So there might have - - there might be some, some time in between. I'm not sure how long that time is.

Q. Okay. Did you ever tell Ms. Linton that you thought she should have gotten the principal job?

A. No.

Q. Did Ms. Linton ask you after the decision was made why she hadn't gotten the principal position?

A. After the inter - - after she didn't get the position there was a meeting in Dr. Dinkins office and Dr. Dinkins - - basically I was just an observer. Dr. Dinkins had a meeting with Kim and Kim - - I mean, Dr. Dinkins said some

-17-

of the things that he said here, that you need to get in a position and then have some successful years in one position and then he felt like she would be considered as a principal. After that meeting I believe my next contact might have been from Mr. Caudle saying that Kim was unhappy with me and I told Mr. Caudle I would go meet with Kim and I did over at Edwards Elementary - - I mean, over at Petersburg Elementary School and the conversation that I had with Kim was that we talked about the interview. I told her that her interview was impotent. I think I may have even — I don't - - I don't know that term I used for it. I don't think I said she should have been selected as principal but I, I think I gave her some affirmations, some encouragement. I did tell her that I also believe that she needed to work in a position for a while and maybe even have other positions like the Alternative School. Kim told me she didn't feel like she would ever become a principal as long as Dr. Dinkins was a superintendent and I told her I didn't feel that way. But I told her, hey, you know, he won't be here forever if that's the way you feel. But I said regardless of that I felt like the - - I did talk with her about the Alternative Ashcool. I told her I thought it would be good experience for her, that she should go over there. Kim told me that she felt like it might be a step down and I told her well, you know, I didn't feel that was but, but that's what she was debating in her mind whether it was a step down or not and she said if I go over there can I be called Director. And I said Kim it doesn't qualify for - - I said before we haven't had anything but a lead teacher in it. It certainly doesn't qualify for the Director's schedule. I said but, I said we can, we can use that term but you have to understand that it is not a Director as we determine a Director in our school district organization and salary is concerned. And she said well she would think about it. And she came - - at some point in time she said she would go if we could call her Director even though she was going to be paid as an assistant principal. So - - and I think - - I guess maybe that meeting I had with her would be called the offer because I was trying to talk her into going. I think - - I even think Dr. Dinkins talked to her about the Alternative School during that meeting too I believe.

(Williams Dep. at pp. 28-31)

Q. All right. I understand. The two principal slots that were filled this year, I talked to Dr. Dinkins about those and they were filled by Ms., I've got Butler. Is that - - is it Buckner?

A. Buckner.

Q. B-u-c-k-n-e-r?

A. With a "N." Uh-huh.

Q. And Ms. Hoffman?

A. Uh-huh. Candice Hoffman.

Q. Those two position were not advertised, were they?

A. No. There was a package of positions that Dr. Dinkins presented all at one

-18-

time. He hired a gentleman from Newberry High School to go to an assistant principal, who was assistant principal to be assistant principal out at Chesterfield High School. There was the position at Chesterfield Ruby Middle which we did advertise for. There were those two that you just talked about. There was a promotion of a lady from Edwards to Cheraw Intermediate School. It might even been one or two. There was kind of an omnibus package in there and those two were part of that package. But those were - - the Superintendent is given the authority to transfer people and he transferred those folks, different folks into different positions, hired a couple from out of the District and presented those all to the Board at one whack.

Q. Ms. Buckner and Ms. Hoffman what two schools did they go into?

A. Ms. Hoffman went to McBee Elementary School. Transferred there and Ms. Buckner was transferred into Edwards Elementary School.

Q. Do you know if any of those ladies had experience as assistant principals in an elementary school?

A. Yes. Ms. Hoffman was an assistant principal at Jefferson Elementary for at least two years. And Ms. Buckner was an assistant principal at the same school, Jefferson Elementary School I think for two years and then Cheraw Intermediate for two years at then Chesterfield-Ruby Middle for one year and then went into the principalship.

Q. And had either of these ladies held a position like Ms. Linton's in which they ran the show?

A. Not like Ms. Linton's, no.

Q. Do you think Ms. Linton is more or less qualified than these individuals to be a principal?

A. I think she is less qualified.

Q. And even though she had just held the position for a year which is closer to principal than assistant principal?

A. You mean to go in now or what are you saying? To go into a position if one came open tomorrow?

Q. To have gone into the principal positions that these two ladies got?

A. Well, she hadn't been running the show at that time.

Q. Aren't these two ladies principals for the 2004-2005 school year?

A. No. I'm talking about Ms. Linton. You said with her having now run the show would she be more qualified or less qualified. Is that what you are saying?

Q. Ms. Hoffman - -

A. Maybe I misunderstand you.

Q. Hoffman and Buckner they have become principals for the 2004-2005–

A. Oh, oh, oh. I see what you are saying.

Q. - - school year, right?

A. Okay. Pardon me. No. I think they're more qualified because of years of experience, having taught in elementary schools and having been assistant

-19-

principal longer.
Q. You said the - - you wouldn't consider Ms. Linton's activities as Director
for a year even though she was successful?
A. Oh, I would consider it, but I just don't think she has been there long
enough to make up the gap at this point.
(Williams Dep. at pp. 37-40)

## Standard for Summary Judgement

Defendants filed their motion for summary judgment pursuant to Rule 56, FRCP.  The

moving party bears the burden of showing that summary judgment is proper.  Summary judgment

is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as

a matter of law.  Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Summary

judgment is proper if the non-moving party fails to establish an essential element of any cause of

action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317. Once the

moving party has brought into question whether there is a genuine issue for trial on a material

element of the non-moving party's claims, the non-moving party bears the burden of coming forward

with specific facts which show a genuine issue for trial.  Fed.R.Civ.P. 56(e); Matsushita Electrical

Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party must come

forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably

find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and inferences

to be drawn therefrom must be viewed in the light most favorable to the non-moving party.  Shealy

v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may not rely on

beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.

Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on must meet

"the substantive evidentiary standard of proof that would apply at a trial on the merits."  Mitchell v.

Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

## Analysis

There are two methods of proving a case of intentional discrimination under Title VII: the method set forth in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) (mixed-motive) and the method established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)(pretext).[3]

Under the McDonnell Douglas[4] analysis, plaintiff has the initial burden of demonstrating a *prima facie* case of discrimination.  In order to prove a prima facie case of discrimination for failure to promote, she must prove that (1) she is a member of a protected group; (2) she applied for the position in question; (3) she was qualified for the position; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination.  Taylor v. Virginia Union University, 193 F. 3d 219, 230 (4th Cir. 1999).  An inference of discrimination is established when a person outside the protected class was chosen for the position.  Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994).

Once plaintiff has established a *prima facie* case, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the termination.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 ((1981).  This is merely a burden of production, not of

---

[3]  Plaintiff asserts that the Supreme Court's opinion in Desert Palace v. Costa, 539 U.S. 90 (2003) in essence eliminates the burden shifting scheme and necessity of the pertinent *prima facie* case established in McDonnell Douglas.  Clearly, in this circuit, this argument is without merit.  See Diamond v. Colonial Life & Accident Ins. Co., — F.3d —, 2005 WL 1713188 (4th Cir. 2005);  Hill v. Lockheed Martin Logistics Mgmt, Inc., 354 F.3d 277 (4th Cir. 2004).

[4]  The McDonnell Douglas analysis was refined in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993), and Reeves v. Sanderson Plumbing Products, Inc., – U.S. –, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

persuasion.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).   Once the defendant has

met its burden of production by producing its legitimate, nondiscriminatory reason, the sole

remaining issue is "discrimination *vel non*."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S.

133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)).   In

other words, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence

that the legitimate reason produced by the defendant is not its true reasons, but were pretext for

discrimination.  Reeves, 530 U.S. at 143.  During all of the burden shifting scheme set forth in

McDonald Douglas, the ultimate burden of proving that defendant intentionally discriminated against

the plaintiff remains at all times with the plaintiff.  Plaintiff has the ultimate burden of presenting

evidence from which a reasonable jury could conclude defendant intentionally discriminated against

her based on her race.

Defendant does not dispute that plaintiff presents a *prima facie* case of discrimination.

Defendant asserts that they have proffered  legitimate, nondiscriminatory reasons for the adverse

employment action and plaintiff fails to present an issue of fact regarding pretext, and that no

reasonable juror could conclude that race was a factor in defendant's decision making process.

Defendant proffers that plaintiff was not hired because of her unsuccessful interview, her lack

of experience in working with younger students as compared to Mr. Nutt, and her questionable

judgment in choosing to involve a school board member in her personal situations with the defendant

rather than following the chain of command.

Plaintiff challenges defendants proffered reasons on several fronts.  First, plaintiff asserts that

there is evidence of discrimination in the objective prong of the selection process, the screening

process.  Specifically, the job posting contained a "required" qualification of five years teaching

experience which plaintiff possessed and Mr. Nutt did not possess. Defendant counters this undisputed fact with evidence that although the form states that it is "required", it is not unusual to deviate from the standard qualifications contained on the job posting. It is unclear whether or not prior deviations have involved "required" qualifications or "contingent"[5] qualifications. Nonetheless, in the light most favorable to the plaintiff, defendant's explanation is suspect. How would an applicant, or perspective applicant, know that the "requirement" is not actually required? The form speaks for itself and there is no room for interpreting the job posting in any way other than it was required. While defendant presents evidence that they generally do not adhere strictly to the criteria set forth in the job postings, it is not sufficient to avoid an issue of fact. It is undisputed that Nutt did not have five years teaching experience and that plaintiff possessed the qualification. Regardless of the truth of defendant's statements that the criteria was not strictly followed, it is not clear that the facts and circumstances in this case fell within the normal deviation criteria or under what circumstances "required" criteria was not followed. Also, it is undisputed that, in any event, the posting requirements were not followed <u>sometimes</u>. Coupled with the vagueness in the testimony of Dr. Williams and Dr. Dinkins, under Rule 56 standards, this does constitute some inference of discrimination in the light most favorable to the plaintiff.

Assuming, *arguendo*, no issue of fact exists as to the job posting "requirement," the second step of the selection process should be addressed. The second step in the process is the subjective decision making process. Of course, the record does not disclose whether or not Dr. Dinkins would

---

[5] As an example, defendants state that plaintiff was hired as an assistant principal while she did not have an Elementary Certificate. The job posting for the principal's position states that an Elementary Certificate is required or that the applicant be eligible for certification. The job postings for other jobs in not provided.

have chosen plaintiff for the Pageland position had Mr. Nutt not been a candidate.  Although both

plaintiff and defendant devote a substantial effort in comparing the two applicants, plaintiff and Mr.

Nutt, other than the five year teaching "requirement," the evidence is undisputed that both candidates

possessed similar qualifications.  Defendants proffer and present evidence that plaintiffs interview

was less successful, defendant considered important her experience , or lack of experience, in

working with younger students as compared to Mr. Nutt, and its perception of her questionable

judgment in choosing to involve a school board member in her personal situations with the defendant

rather than following the chain of command.  This evidence in essence is undisputed.  Some may

view certain experience more beneficial than other experience, etc., etc.  However, it is not necessary

to decide "whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the

reason for the plaintiff's termination."[6]     Hawkins v. Pepsico, 203 F.3d 274, 279 (4thCir.

2000)(quoting and citing DeJarnette v. Corning, Inc., 133 F.3d 293, 299(4th Cir. 1998); DeJarnette,

133 F.3d at 299 ("[T]his Court does not sit as a kind of super-personnel department weighing the

prudence of employment decisions made by firms charged with employment discrimination ...."

(internal quotation marks omitted)); Henson v. Liggett Group, Inc., 61 F.3d 270, 277 (4th Cir.1995)

("We have recognized the importance of giving an employer the latitude and autonomy to make

business decisions, including workplace reorganization, as long as the employer does not violate the

ADEA."); Jiminez v. Mary Washington College, 57 F.3d 369, 377 (4th Cir.1995) ("Title VII is not

a vehicle for substituting the judgment of a court for that of the employer").  It is the perception of

---

[6] "Proof that the employer's proffered reasons in unpersuasive, or even obviously
contrived, . . . does not necessarily establish that [plaintiff's] proffered reason (race
discrimination) . . . is correct."  Reeves, 530 U.S. at 146-47.  "It is not enough to disbelieve the
[employer]."  Love-Lane v. Martin, 355 F.3d 766, 788 (4th Cir. 2004).  Plaintiff must show a
reasonable jury could "believe [her] explanation of intentional race discrimination."  Id.

the employer that is critical.  Hawkins, 203 F.3d at 280.  Even a reasoned decision based on incorrect

facts is not evidence of pretext.  Pollard v. Rea Magnet Wire Co., 824 F.3d 557, 559 (7th Cir. 1987),

cert. denied, 484 U.S. 977 (1987).

        In other words, if the district judge does not agree that an issue of fact exists as to the

legitimacy of defendant's explanation for not adhering to the job posting requirements, the

comparison based on other factors does not present an issue of fact.  The undersigned, however,

finds an issue of fact is created by the defendant's failure to adhere to its job posting.  While

defendant's explanation is perfectly plausible and a reasonable juror may very well believe it, it also

is true that a reasonable juror could find it suspect.  Defendant asserts that many times the applicant

pool was quite small.  Why would the defendant post job qualifications which included a past

experience "requirement" that may deter an applicant that did not possess such a requirement to

submit an application?  In the light most favorable to the plaintiff, a reasonable juror could believe

defendant's explanation is false.  And, if a reasonable juror found the explanation false, it follows

that the remainder of defendant's legitimate, nondiscriminatory reasons proffered are tainted.[7]

_____

        [7] Generally, a plaintiff must show each of defendant's reasons are suspect.  See
Machinchick v. PB Power, Inc., 398 F.3d 345 (5th Cir. 2005)( employee must put forward
evidence rebutting each one of employer's nondiscriminatory explanations for employment
decision at issue); Olsen v. Marshall & Ilsley Corporation, 267 F.3d 597,601 (7th Cir.
2001)(plaintiff must show each of defendant's reasons is pretextual to withstand summary
judgment); see also Chapman v. A.I. Transport, et al., 229 F.3d 1012, 1037 (11th Cir.
2000)(stating in dicta that plaintiff must produce sufficient evidence to refute each of the
employer's proffered reasons). However, in Olsen, the Seventh Circuit did note an exception to
this rule that they have recognized.  "'There may be cases in which the multiple grounds offered
by the defendant for the adverse action . . . are so intertwined, or the pretextual character of one
of them so fishy and suspicious, that the plaintiff could withstand summary judgment' by
pointing out the pretextual nature of one reason."  Id. (citing and quoting Wolf v. Buss
(America), Inc., 77 F.3d 914, 920 (7th Cir. 1996).

Finally, plaintiff argues that two subsequent openings for principal positions occurred in 2004.  It is undisputed that Dr. Dinkins never had appointed a person to a principal's position without posting or interviewing for the position.  It is undisputed that neither of these positions were posted and no one was interviewed for either position.  It is undisputed that Dr. Dinkins appointed two white females into the positions.[89]  Defendant's explanation may be perfectly plausible for this action, as well as for the other actions involved in this case.  However, under Rule 56 all the facts and inferences to be drawn therefrom must be viewed in the light most favorable to the plaintiff.  Under the facts and circumstances of this case, a reasonable juror could conclude that race was a factor in defendant's decision to not promote plaintiff to a position as principal.  Therefore, defendant's motions for summary judgment against plaintiff's claims under Title VII and §1981 via §1983 should be denied.

Plaintiff also alleges a breach of contract cause of action under state law.  Specifically, she asserts a breach of contract based on a statement contained in a policy manual which reads as follows:

> The district is required by federal and state laws, executive orders, rules and regulations not to illegally discriminate on the basis of race religion, color, disability, sex, age, alienage, national origin, or marital status.  The district, therefore, commits itself to nondiscrimination in all its education and employment activities.

(Plaintiff's Complaint at ¶33).

Plaintiff claims that this creates a contract between plaintiff and defendant which prohibits

---

[8]  In the light most favorable to the plaintiff, Dr. Dinkins knew plaintiff was interested in the positions.

[9]  Defendant has not challenged the appropriateness of considering this evidence.

the denial of a promotion based on race.  The South Carolina Supreme Court filed on July 18, 2005, a decision confronting a very similar argument in <u>Hessenthaler v. Tri-County Sister Help, Inc.</u>, 2005 WL 1677902 (S.C. 2005).  After finding the disclaimer conspicuous as a matter of law, the Court held that "a general policy statement[10] of nondiscrimination does not create an expectation that employment is guaranteed for any specific duration or that a particular process must be followed before an employee may be fired."  <u>Id</u>. at 4.

The policy statement involved in this case is a general policy statement similar to that involved in <u>Hessenthaler</u> and does not create a promise as a matter of law.  Therefore, defendant's motion for summary judgment as to plaintiff's breach of contract claim should be granted.[11]

For the foregoing reasons, defendant's motions for summary judgment should be granted in part and denied in part as set forth above.


August 19, 2005                                  s/Thomas E. Rogers, III
Florence, South Carolina                         Thomas E. Rogers, III
                                                 United States Magistrate Judge


**The parties' attention is directed to the important notice contained on the following page(s).**

---

[10]  The policy statement included the following language: "[The Shelter] is an equal opportunity employer.  All decisions, including hiring, training, and promotion, are made without regard to race, color, national origin, sex, age, handicap, sexual preference, or any other protected status."

[11]  Defendant also argues that the contract claim should be dismissed because such a claim should be analyzed under the same standard as a Title VII claim and claim under 42 U.S.C. §1981.  It is assumed that defendant is arguing that Title VII in some way preempts a state contract law claim.  This argument is specious at best.  <u>See</u>  <u>California Fed. Savings & Loan Ass'n v. Guerra</u>, 479 U.S. 272, 282-84 (1987)(Title VII only preempts state law inconsistent with it).  In any event, because an issue of fact exist under the Title VII/§1981 analysis, the argument is without merit for the same reasons discussed above.

## Notice of Right to File Objections to Magistrate Judge's "Report and Recommendation"

### &

### The Serious Consequences of a Failure to Do So

The parties are hereby notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within ten (10) days of the date of service. 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail. Fed. R. Civ. P. 6. A magistrate judge makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge. *See* Mathews v. Weber, 423 U.S. 261, 270-271 (1976); and Estrada v. Witkowski, 816 F. Supp. 408, 410, 1993 U.S.Dist. LEXIS® 3411 (D.S.C. 1993).

During the ten-day period for filing objections, but not thereafter, a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he or she wishes the United States District Judge to consider any objections. Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections. *See* Keeler v. Pea, 782 F. Supp. 42, 43-44, 1992 U.S.Dist. LEXIS® 8250 (D.S.C. 1992); and Oliverson v. West Valley City, 875 F. Supp. 1465, 1467, 1995 U.S.Dist. LEXIS® 776 (D.Utah 1995). Failure to file written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge. *See* United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir.), *cert. denied*, Schronce v. United States, 467 U.S. 1208 (1984); and Wright v. Collins, 766 F.2d 841, 845-847 & nn. 1-3 (4th Cir. 1985). Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he or she did not object. In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues. Howard v. Secretary of HHS, 932 F.2d 505, 508-509, 1991 U.S.App. LEXIS® 8487 (6th Cir. 1991). *See also* Praylow v. Martin, 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied*, 474 U.S. 1009 (1985). In Howard, supra, the Court stated that general, non-specific objections are *not* sufficient:

> A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless. * * * This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. * * *  We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.

*Accord* Lockert v. Faulkner, 843 F.2d 1015, 1017-1019 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

> Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review. * * * A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.

*See also* Branch v. Martin, 886 F.2d 1043, 1046, 1989 U.S.App. LEXIS® 15,084 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and Goney v. Clark, 749 F.2d 5, 7 n. 1 (3rd Cir. 1984)("plaintiff's objections lacked the specificity to trigger *de novo* review"). This notice, hereby, apprises the plaintiff of the consequences of a failure to file specific, written objections. *See* Wright v. Collins, supra; and Small v. Secretary of HHS, 892 F.2d 15, 16, 1989 U.S.App. LEXIS® 19,302 (2nd Cir. 1989). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections addressed as follows:

Larry W. Propes, Clerk
United States District Court
Post Office Box 2317
Florence, South Carolina  29503

-28-